So Ordered.

Dated: June 12, 2026



G. Michael Halfenger
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Cytophil, Inc.,

Debtor.

Case No. 25-20576-gmh
Chapter 11

**OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON HEALTH POLICY ASSOCIATES, INC.'S OBJECTION TO CLAIM NUMBER 10 OF JANSSON MUNGER & MCKINLEY LTD.**

Creditor Health Policy Associates, Inc., objects that creditor Jansson Munger & McKinley Ltd.'s claim for breach of contract is barred in substantial part by Wisconsin's statute of limitations. Precedent demonstrates that the claim is timely.

I

A

In June 2015 Merz North America, Inc. (Merz) sued Cytophil, Inc., in the United States District Court for the Eastern District of North Carolina alleging that Cytophil's Renú® Voice injectable vocal fold implant infringed Merz's patent. *Merz N. Am., Inc. v.*

*Cytophil, Inc.*, No. 5:15-cv-262, ECF No. 1 (E.D.N.C. June 18, 2015).[1] In August 2015 Cytophil engaged Jansson Munger & McKinley Ltd. (Jansson or the firm) to represent it in its litigation with Merz.[2] Ex. 101. Firm lawyers Peter and Eric Jansson filed notices of appearance in the North Carolina case on September 29, 2015; two days later they filed Cytophil's motion to dismiss that case, contending that the court lacked jurisdiction and that venue was improper. *Merz N. Am. Inc. v. Cytophil*, No. 5:15-cv-00262, ECF Nos. 23–26.

In April 2016, Cytophil—represented by Jansson as part of the same engagement—filed a complaint against Merz and its parent company in the United States District Court for the Eastern District of Wisconsin alleging that those parties had engaged in false marking under the §292 of the Patent Act, 35 U.S.C. §292, and unlawful monopolization under §2 of the Sherman Act, 15 U.S.C. §2. *Cytophil, Inc. v. Merz N. Am. Inc.*, 2:16-cv-00423, ECF No. 1 (E.D. Wis. Apr. 6, 2016). In August 2016, Judge Adelman transferred the Eastern District of Wisconsin case to the Eastern District of North Carolina, which jointly administered the cases until their conclusion. *Id.* at ECF No. 67; see also *Merz N. Am., Inc. v. Cytophil, Inc.*, No. 5:15-cv-00262, ECF No. 191. After about four years of proceedings before District Judge Howard and Magistrate Judge Swank, including discovery, extensive motion practice, and a *Markman*[3] claim-construction

---

1. The court takes judicial notice of the public records in the *Merz* litigation, specifically the records in *Merz N. Am., Inc. v. Cytophil, Inc.*, No. 5:15-cv-00262 (E.D.N.C. filed June 18, 2015), and *Cytophil, Inc. v. Merz N. Am. Inc.*, 2:16-cv-00423 (E.D. Wis. filed April 6, 2016), to provide context for the parties' current dispute. See Fed. R. Evid. 201(b) & (c)(1); see also *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("'The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records.'" (quoting 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Fed. Prac. & Pro.: Evid.* § 5106, at 505 (1st ed. 1977 & Supp. 1997))). Jansson's pretrial brief requested that the court take judicial notice of those court records (ECF No. 240, at 2 n.1), and HPA did not object to that course. See Fed. R. Evid. 201(c)(2) & (e).

2. When the engagement letter was executed, the law firm's name was Jansson Munger McKinley & Shape Ltd. Ex. 101, at 1. The proof of claim was filed by Jansson Munger & McKinley Ltd. See Claim No. 10.

3. *Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996).

hearing, the parties reached a mediated settlement that resulted in the dismissal of all claims on June 6, 2019. *Merz N. Am., Inc. v. Cytophil, Inc.*, No. 5:15-cv-262, ECF No. 313; see also Case No. 25-20576, Evidentiary Hr'g Test., ECF No. 245.

B

Although Cytophil made regular partial payments to Jansson through April 2018, Cytophil owed the firm more than $1.3 million when the litigation concluded in 2019. See Exs. 3 & 4. In April 2025, Jansson filed proof of claim number 10, alleging that Cytophil owed it $1,327,902.28 in unpaid legal fees. Claim No. 10-1. Jansson supported the claim with ledgers showing Cytophil's indebtedness for services rendered in the *Merz* litigation and those ledgers reflect charges that the firm had invoiced from 2015 to 2019.[4] *Id.* at Parts 5 & 6; Exs. 3 & 4. Cytophil does not contest Jansson's claim. It scheduled Jansson as holding a nonpriority unsecured claim for $1,327,902.28 that is liquidated and undisputed. ECF No. 36, at 12.

Health Policy Associates, Inc. (HPA), which asserts a (roughly) $727 thousand default judgment claim against Cytophil, objects to the allowance of Jansson's claim in its full amount, contending that Jansson's alleged damages are mostly time-barred by Wisconsin's six-year statute of limitations and thus are not allowable under 11 U.S.C. §502(b)(1). See 11 U.S.C. §502(b)(1) (". . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of filing the petition, and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor . . . under any . . . applicable law . . ."); ECF No. 113, at 4–6; ECF No. 241, at 2–5; & ECF No. 251. HPA argues that Jansson's invoices were due on receipt; as a result, Jansson's bankruptcy claim may only

---

4. While the firm treated its representation of Cytophil against Merz as a single engagement, it kept separate ledgers for the defense of the patent claims and prosecution of Cytophil's false marking and antitrust claims to preserve Cytophil's ability to recover its legal fees from Merz, including under 35 U.S.C. §285, if it prevailed in the litigation. Case No. 25-20576, Evidentiary Hr'g Test., ECF No. 245.

be allowed to the extent it consists of fees that Jansson first invoiced within six years of the date on which Cytophil filed its bankruptcy petition—invoices totaling only about $204 thousand. ECF No. 241, at 4. HPA contends that the remainder of Jansson's claim is not allowable under §502(b)(1) because each earlier unpaid invoice constitutes a separate contract cause of action that accrued more than six years before the debtor filed for bankruptcy and thus is barred by Wisconsin's six-year statute of limitations, Wis. Stat. §893.43(1).

Jansson responds (among other things) that it holds a single claim for unpaid fees for representing Cytophil in the *Merz* litigation and that a total breach of the engagement agreement did not occur—thus its breach of contract claim did not accrue—until the representation ended in June 2019 and Cytophil failed to pay the amounts owed.[5] ECF No. 240, at 7–8 & ECF No. 250. Therefore, Jansson argues, its claim—the validity of which is determined as of February 4, 2025, the date on which Cytophil filed its bankruptcy petition (see §502(b)(1))—is timely under Wisconsin's six-year statute of limitations.[6] ECF No. 240, at 7–8 & ECF No. 250.

II

Jansson's claim arises under Wisconsin law. This court's task in applying Wisconsin law is to "make [its] best prediction of how the Wisconsin Supreme Court

---

5. Jansson alternatively contends that public policy and Cytophil's conduct tolled the statute of limitations. See ECF No. 240, at 5–11. HPA disagrees. This opinion does not resolve those issues because it concludes that Jansson's claim accrued less than six years before Cytophil's bankruptcy filing and thus is not time-barred.

6. On March 18, 2026, the court conducted an evidentiary hearing on HPA's objection to allowance of Jansson's claim. ECF No. 245 & 247. This ruling contains the court's findings of fact and conclusions of law for purposes of Rule 52(a)(1). See Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52) & 9014(c) (making Rule 7052 applicable to contested matters). Jansson, as the claimant, has the burden of proof. *In re Breit*, 490 B.R. 821, 824 (Bankr. N.D. Ind. 2013) ("[W]hen an objection is raised, the validity and/or amount of the claim is contested and the objector . . . must provide evidence supporting the objection and refuting the claim. If the objector meets her burden of production, the burden then shifts to the claimant to prove the validity and/or amount of the claim." (citing *In re VanCleef*, 479 B.R. 809, 821 (Bank. N.D. Ind. 2012))).

would resolve the issues presented." *Daniels v. United Healthcare Servs., Inc.*, 74 F.4th 803, 806 (7th Cir. 2023) (citing *BMD Contrs., Inc. v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 648 (7th Cir. 2012), and *Thirteen Inv. Co. v. Foremost Ins. Co. Grand Rapids Mich.*, 67 F.4th 389, 392 (7th Cir. 2023)); see also *Thirteen Inv.*, 67 F.4th at 392 ("When faced with unresolved issues of state law, we must predict how the relevant highest state court would rule." (citing *Sanchelima Int'l, Inc. v. Walker Stainless Equip. Co., LLC*, 920 F.3d 1141, 1145 (7th Cir. 2019))); see also *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir.1997) ("As a court sitting in diversity, we apply the law of Illinois and attempt to predict how the Illinois Supreme Court would decide the issues presented here." (footnote omitted)).

A

Wisconsin law provides that, subject to inapplicable exceptions, "an action upon any contract, obligation, or liability, express or implied, including an action to recover fees for professional services, . . . shall be commenced within 6 years after the cause of action accrues or be barred." Wis. Stat. §893.43(1). Jansson's claim against Cytophil is one for professional services owed under a contract. Under §502 of the Bankruptcy Code, Jansson's bankruptcy claim is deemed to have commenced "an action" for statute of limitations purposes on February 4, 2025, the date Cytophil filed its bankruptcy petition. See *In re Promise Healthcare Grp, LLC*, 130 F.4th 56, 60–62 (3d Cir. 2025). The court therefore must determine whether Jansson's claim "accrue[d]" for purposes of Wis. Stat. §893.43(1) before February 4, 2019.

Wisconsin precedent appears to answer the question. In the venerable *Lowe v. Ring*, the Wisconsin Supreme Court ruled that an attorney's cause of action for unpaid legal services does not accrue until his representation of the client concludes: "The rule . . . is that the statute [of limitations] does not commence to run upon an attorney's claim for services and disbursements until the termination of the proceeding in which they were rendered, where his employment was to conduct such proceeding to its

termination, or until the employment is otherwise terminated." 82 N.W. 571, 573 (Wis. 1900); see also *Lackner v. McKechney*, 252 F. 403, 408–09 (7th Cir. 1918) ("Appellants' claim is based upon a general employment for certain litigation, not for a fixed time on a fixed salary. The cause of action, therefore, does not accrue from day to day, but only at the termination of the service." (applying Illinois law)). If *Lowe* governs, then Jansson's claim is timely, because Cytophil engaged Jansson to represent it in the *Merz* litigation (consisting of the patent-antitrust proceedings in the Eastern District of North Carolina and the Eastern District of Wisconsin) and that litigation ended in June 2019, less than six years before Cytophil commenced this bankruptcy case in February 2025.[7]

HPA contends that *Lowe*'s accrual principle does not apply here because Jansson's engagement agreement expressly required Cytophil to pay Jansson's invoices immediately. See Ex. 101, at 2 ("Payment of our firm's monthly invoices for services and outlays is due upon receipt."). HPA emphasizes that the Wisconsin Supreme Court declared in 1993, "[i]n Wisconsin, a 90–year line of precedent holds that '[i]n an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs.'" *CLL Assocs. Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 117 (Wis. 1993) (quoting *State v. Holland Plastics Co.*, 331 N.W.2d 320, 325 (Wis. 1983) (citations omitted)); see also ECF No. 251, at 4–7. Because Cytophil's failure to pay the invoices immediately is a breach of the engagement agreement, HPA argues, *CLL* requires this court to conclude that Cytophil breached the agreement each time it failed to immediately pay an invoice in full—giving rise to a series of contract breaches, most of which arose more than six years before Cytophil filed its bankruptcy petition.

But neither *CLL* nor any other Wisconsin Supreme Court case purports to

---

7. HPA does not dispute these facts and, in all events, Jansson proved that Cytophil engaged the firm in August 2015 to serve as Cytophil's counsel in its continuing litigation with Merz and that the engagement ended in June 2019.

overrule or narrow *Lowe*'s directive that the statute of limitations "does not commence to run upon an attorney's claim for services and disbursements until the termination of the proceeding in which they were rendered, where his employment was to conduct such proceeding to its termination, or until the employment is otherwise terminated." 82 N.W. at 573. *CLL* does not mention *Lowe.* And *Lowe*'s 126-year-old accrual rule has at least the same historical purchase as the accrue-on-breach rule the Wisconsin Supreme Court invoked in *CLL*. Indeed, the legal-services accrual rule the Wisconsin Supreme Court employed in its 1900 *Lowe* opinion was declared "clear and well settled" in Illinois before the Civil War: "The statute of limitations could not commence running till the [legal] services contracted for had been performed, by the termination of the suit, or the contract of retainer had, in some other mode, been determined." *Walker v. Goodrich*, 16 Ill. 341, 343 (Ill. 1855); see also *Matchett v. Rose*, 344 N.E.2d 770, 778 (Ill. App. Ct. 1976) ("A cause of action for enforcement of an attorney's professional services contract to conduct certain litigation accrues from the time the services contracted for have been performed by the ending of the action or by termination of the retainer in some other mode." (citing *Walker*)). No accrual rule tied to the provision of discrete litigation services, *Walker* reasons, can be practically administered in a way that best serves the ends of the adversary process:

> No other case than this could be required to illustrate the propriety of this rule. Here was a suit pending in court for more than twelve years, during all of which time the defense was conducted by these solicitors, with great ability, and the most constant assiduity, requiring, at one time, an almost constant attendance before the master, for about nine months, in stating the accounts of a partnership involved in that suit. Did the statute of limitations commence running at the termination of each day, as to the services rendered on that day? Were the solicitors obliged to pause in their defense, within each period of five years, to commence a suit against their clients for the services already performed, or forfeit them? The very statement of the proposition shows how embarrassing, inappropriate, and indeed, impracticable, such a rule would be.

*Walker*, 16 Ill. at 343 (citations omitted).

While of long lineage, the *Lowe* rule is no relic. In 2009 the Michigan Supreme Court held that in the context of an attorney having continuing duties to represent his client in litigation, the attorney's contract claim against the client for nonpayment of fees did not accrue until "the date that the attorney-client relationship was terminated", even though contract-claim accrual under Michigan law, as under Wisconsin law, "generally begins to run on the date the breach occurs." *Seyburn, Kahn, Ginn, Bess, Deitch and Serlin, P.C. v. Bakshi*, 771 N.W.2d 411, 413, 418 (Mich. 2009). The Michigan Supreme Court reasoned that the lawyer's ethically imposed duties to continue representing the client justified applying the same end-of-representation exception to the general accrue-upon-breach rule that *Lowe* recognized more than a century earlier:

> A contract is breached when one party fails to perform its portion of the contract. Thus, under general contract principles, an attorney's cause of action to recover attorney fees would accrue on the date the client breached the parties' agreement by failing to pay in accordance with its terms. We conclude that, in the context of litigation, the special features of the attorney-client relationship necessitate an exception to the general rule where the client breaches the agreement during the representation. Once litigation has commenced, an attorney cannot discontinue serving his or her client without an order of the court because an attorney's ability to terminate the representation may be limited by his or her responsibilities to the client. **Although the client may have ceased making payments to the attorney, the attorney's representation of the client continues until the court has permitted the termination.**

*Id.* at 418–19 (emphasis added) (footnotes omitted). Appellate courts in other jurisdictions have reached the same conclusion. See *Pellettieri, Rabstein & Altman v. Protopapas*, 890 A.2d 1022, 1023 (N.J. Super. Ct. App. Div. 2006) ("[T]he statute of limitations for attorney fees arising from a retainer agreement, permitting periodic hourly billing, commences when the services are concluded or attorney-client relationship is ended, whichever occurs first."); see also *Mitchell v. Guardian Sys., Inc.*,

804 A.2d 1004, 1008 (Conn. App. Ct. 2002) ("When the claim for attorney['s] fees is based upon continuous legal representation, the statute of limitations does not begin to run until the legal services are complete. . . . The statute of limitations is tolled during the pendency of the continuous representation." (quoting *Doe v. State*, 579 A.2d 37, 41 (Conn. 1990))); *Rosen Hagood, LLC v. Henson*, No. 2022-001070, 2025 WL 1454472, at *3 (S.C. Ct. App. May 21, 2025) (nonprecedential) ("Claims by attorneys seeking unpaid fees differ from typical breach of contract claims that accrue at the moment of breach because attorneys owe a fiduciary duty to their clients and cannot unilaterally withdraw from representation without permission from the court, which could result in the attorney-client relationship continuing after the initial breach."); *Skiles DeTrude v. Dollar Gen. Stores*, No. 1:07-cv-940, 2009 WL 499542, at *3 (S.D. Ind. Feb. 27, 2009) ("The general rule, in Indiana and elsewhere, has long been that '[t]he employment of an attorney to represent a party to an action is a single employment, and the statute of limitations does not begin to run against his claim for services until such action or suit has terminated-until judgment has been rendered in the cause in which he has been retained.'" (quoting *Felt v. Mitchell*, 88 N.E. 723, 723 (Ind. Ct. App. 1909))).

Judge Adelman, moreover, recently concluded that Wisconsin law continues to provide that an attorney's claim against his client for breach of contract does not arise until the attorney-client relationship ends:

> A claim for breach of contract, like any claim, accrues when "there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it." But an attorney cannot enforce a claim against his or her client until the attorney-client relationship ends, and attorneys are not free to withdraw from representation at will. *See* Wis. SCR 20:1.7 (conflicts of interest); 20:1.16 (terminating representation). Therefore, the earliest a breach-of-contract claim could be capable of enforcement is the date when the attorney-client relationship for a particular matter ends.

*Hudec v. Prpa*, 820 F. Supp. 3d 786, 789 (E.D. Wis. 2026) (quoting *Pritzlaff v. Archdiocese of*

*Milwaukee*, 533 N.W.2d 780, 785 (Wis. 1995)).

B

HPA would distinguish *Lowe, Hudec, Lackner*, and similar authorities as applicable only when there is "uncertainty over precisely when fees come due." ECF No. 251, at 4. As mentioned above, HPA argues that because the Jansson-Cytophil agreement provides that fees were due when invoiced, Jansson's claim to recover fees is limited to fee amounts that it first invoiced within the six-year limitations period. *Id.* at 5 (citing J.J. Marticelli, Annotation, *When Statute of Limitations Begins to Run Against Action by Attorney, Not Employed on Contingent Fee Basis, for Compensation for Services*, 60 A.L.R.2d 1008, §§1 & 3 (Originally Published in 1958)). "Attorneys fee claims", says HPA, "are just like other contracts claims: they expire six years from accrual", and *CLL* requires that "accrual occurs 'at the moment the contract is breached[.]'" ECF No. 251, at 4 (quoting *CLL*, 497 N.W.2d at 116).

Even if Wisconsin law generally requires treating each unpaid invoice as giving rise to a distinct contract claim for statute of limitations purposes, *Lowe* and the other authorities discussed above show that courts have long applied a different accrual rule to attorneys' agreements to represent clients in litigation. And the application of *Lowe* and the rest of those opinions cannot sensibly be limited to engagement agreements that do not specify when payment of fees is due—there certainly was no uncertainty about when fees came due in *Pellettieri*. Like Jansson's engagement agreement, the attorney's original agreement in *Pellettieri* provided, "All bills which are submitted are due and payable when rendered." 890 A.2d at 1024 (emphasis omitted). Later the attorney wrote the delinquent client, "This firm can no longer continue to represent you if you do not begin to make monthly payments to satisfy your bill. At a minimum, I will require you to make monthly payments of $4,000.00 starting on March 31, 1997 and continuing each month until the balance of the bill has been paid." *Id.* Even though both the original agreement and subsequent dealings specified payment deadlines, the appellate court

reversed the trial court's ruling that "the plaintiff's cause of action accrued when defendant failed to pay the due periodic bills", because, as the appellate court explained, the lower court "mistakenly relied on general contract principles", i.e., the accrue-upon-breach rule that HPA champions here. *Id.* at 1027. *Pellettieri* reasons that the continuing duties that the Rules of Professional Responsibility impose on counsel to continue representing a client in litigation make accrual of a cause of action "[u]nlike the general commercial transaction . . . where the 'critical point' for the determination of accrual of the cause of action is the date when the payment of the invoice becomes due". *Id.* "[A]n attorney's cause of action", *Pellettieri* holds, "does not accrue based upon non-payment alone. More is needed. Specifically, absent completion of services under a retainer agreement, the attorney-client relationship must be terminated before plaintiff's cause of action accrues." *Id.* And, under the applicable rules of professional responsibility, as *Pellettieri* further explains, a lawyer cannot withdraw from representing the client unless, among other things, the lawyer obtains permission from the tribunal. *Id.* (citing N.J. Rules Pro. Conduct R. 1.16.). "Simply stated," the opinion reasons, "a lawyer does not have control when it comes to severing the relationship, but must seek client consent and/or court approval, depending upon the circumstances." *Id.* at 1028. As a result, an engagement agreement's statement of when payment is due on interim bills during the representation does not "fix[] when payment [is] due following the completion of the [lawyer-]plaintiff's services or the termination of the relationship". *Id.* at 1029.

Similarly, Cytophil's engagement of Jansson to represent it in the *Merz* litigation was a singular undertaking that gave rise to a continuing duty on Jansson's part to represent Cytophil in the related patent and antitrust cases until the representation ended. See Ex. 101, at 1 (Jansson engagement letter governing "[r]epresentation by Jansson Munger McKinley & Shape Ltd. in connection with *Merz North America, Inc. v. Cytophil, Inc. d/b/a Regenscientific"*); see also Evidentiary Hr'g Test., ECF No. 245.

Jansson's ability to end the representation was constrained by Wisconsin Supreme Court Rule 20:1.16(c), which requires a lawyer seeking to withdraw to "comply with applicable law requiring notice to or permission of a tribunal when terminating a representation". The Rule further provides, "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." *Id.* The local rules of both the Eastern District of North Carolina and the Eastern District of Wisconsin require that private counsel representing parties in civil actions must file a motion to withdraw if they seek to discontinue their representation of a party. See E.D.N.C. L.R. Civ. 5.2(e); see also E.D. Wis. Civ. L.R. 7.1(e). Among other things, a motion to withdraw filed in the Eastern District of North Carolina must "contain a description of the procedural posture of the case" and "state whether the client consents to the motion". *Id.*; see also E.D. Wis. Civ. L.R. 7.1(e)(3) (motion showing good cause to withdraw required unless at least one lawyer will continue to represent the party in the case). These courts' rules make clear, moreover, that "no corporation," such as Cytophil, "may appear as an unrepresented person but must be represented by an attorney". E.D.N.C. L.R. Civ. 5.2(e); see also E.D. Wis. Gen. L.R. 83(e) ("Legal entities, such as corporations . . . must be represented by legal counsel.").

Jansson's agreement to represent Cytophil in the *Merz* litigation thus resulted in a continuing engagement by its terms (since it provided generally for Jansson's representation of Cytophil "in connection with" that litigation), by the intent of its parties, and because the Rules of Professional Responsibility required Jansson to continue providing legal services until the representation was concluded. Ex. 101, at 1; Evidentiary Hr'g Test., ECF No. 245. One consequence of the agreement's continuing nature is that, unlike most commercial contracts, Jansson could not unilaterally declare Cytophil in material breach, discontinue its representation, and sue Cytophil for unpaid invoices. The Rules of Professional Responsibility and the local rules of the courts in which the litigation was pending required Jansson to continue its representation of

Cytophil until the litigation ended, Cytophil fired Jansson, or Jansson requested leave to withdraw as Cytophil's counsel and the court overseeing the litigation granted that request. For these reasons, Cytophil's failure to pay Jansson's interim invoices, while a breach of the engagement's payment term, was not a sufficient basis for Jansson's cause of action to accrue for statute of limitations purposes. For the cause of action to accrue, Jansson had to be relieved of its continuing duty to represent Cytophil. That's the accrual rule required by *Lowe*.

The continuing nature of Jansson's duties to represent Cytophil reconciles *Lowe*'s century-old rule (that claims for unpaid litigation services accrue when the representation ends) with *CLL*'s pronouncement that "a 90-year line of precedent holds that '[i]n an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs.'" 497 N.W.2d at 117 (quoting *State v. Holland Plastics Co.*, 331 N.W.2d 320, 325 (Wis. 1983), and citing, among other authorities, *Segall v. Hurwitz*, 339 N.W.2d 333, 342–43 (Wis. Ct. App. 1983)). *Segall*, one of the precedents on which *CLL* relies, involves a breach of a covenant not to compete in the railroad salvage business. In that context, *Segall* observes that "[c]ontracts requiring continuous performance for a specified period of time" may endure serial ""'partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party.'" *Segall*, 339 N.W.2d at 343 (quoting 4 *Corbin on Contracts* §956 at 841 (1951)). *Segall* instructs about the commercial context, "if the promisor has a continuing duty to perform, generally a new claim accrues for each separate breach . . . The injured party may assert a claim for damages from the date of the first breach within the period of limitation." *Id.* (citation omitted). But *Segall* acknowledges that continuing contracts— contracts requiring enduring performance, such as continuing not to compete in a particular business—may also give rise to an action for "total breach" that arises "by

repudiation or a material failure of performance." *Id*. (citing 4 *Corbin on Contracts* §956 at 841). "If a single total breach occurs, the right to bring an action accrues at that time and the statute of limitations begins to run." *Id*. (citing 4 *Corbin on Contracts* §989 at 967). *Segall*'s recognition that even a previously breached continuing contract may give rise to a cause of action for "total breach", *id*., arising when the contract is repudiated or there is a material failure of performance bridges any gap between *CLL*'s directive that contract claims accrue at breach with *Lowe*'s directive that an attorney's claim for unpaid litigation services "does not commence . . . until the termination of the proceeding . . . or until the employment is otherwise terminated." 82 N.W. at 573. When the proceeding ends or the representation is otherwise terminated, there is a single "total breach" that gives rise to a claim for all unpaid fees.[8] See Robert L. Rossi, 1 Attorneys' Fees § 12:5 (3d ed.) ("[W]here an attorney's employment is regarded as

---

8. Jansson and its client, Cytophil, were mutually involved in pursuing a favorable outcome for the company throughout the *Merz* litigation. Greg Johnson, Cytophil's president and CEO, testified that Cytophil needed Jansson's continuing representation to obtain the settlement. Evidentiary Hr'g Test., ECF No. 245. This continuing mutual undertaking engaged in collectively by Cytophil, as client, and Jansson, as its counsel, as well as the obligations that court and professional responsibility rules imposed on Jansson to continue that representation until that engagement concluded or the court relieved Jansson of that responsibility distinguishes (for claim accrual purposes) the circumstances here from those in cases such *Jensen v. Janesville Sand & Gravel Co.*, 415 N.W.2d 559, 561 (Wis. Ct. App. 1987), and *Noonan v. N.W. Mut. Life Ins. Co.*, 687 N.W.2d 254, 262 (Wis. Ct. App. 2004). Neither the pension recipient in *Jensen* nor the annuity beneficiaries in *Noonan* were engaged in ongoing collective undertakings with their defendants. And in contrast to the court and professional responsibility rules that required Jansson's ongoing performance until the termination of the representation, nothing constrained the plaintiffs in those cases, legally or practically, from suing for breach of contract, since they had fully completed performance of their duties under the contracts at issue, and all the defendants were obligated to do was make installment payments. See *Jensen*, 415 N.W.2d at 562 (Rejecting argument that the defendant's repudiation of the contract resulted in a total breach and stating, "*Segall* involved the continuing obligations of defendants under their agreement not to compete and not to use a business name. On the facts before us, the [defendant's] only duty of performance was to pay money in installments not related to one another. In such a situation repudiation does not give rise to a claim for damages for total breach."); *Noonan*, 687 N.W.2d at 262 (following *Jensen*'s application of the continuing violation rule where the defendant's only duty was to make payments). In all events, these court of appeals decisions addressing materially different circumstances do not provide a sound justification for concluding that the accrual rule the Wisconsin Supreme Court applied in *Lowe* is not equally applicable to Jansson's cause of action against Cytophil.

being single and continuous, his claim for services is not subject to the running of the statute of limitations until the termination of the employment, the contract being regarded as an entire one, but where his services are severable and distinct, with no identifying continuity, the statute will begin to run on each service at the time it is rendered." (citing *Lowe v. Ring* among other authorities)); see also *Wilson v. Wilson*, 75 P.2d 277, 279–80 (Kan. 1938) ("[A]n attorney's contract to represent his client is usually regarded as entire and continuous. . . . Under such employment nothing but death, resignation, or discharge would end such a contract of employment until the proceedings were terminated, and they were not terminated before the order was filed with the clerk of the court." (Kansas law)).

C

Jansson's representation of Cytophil ended no earlier than June 6, 2019, the date the District Court for the Eastern District of North Carolina dismissed the *Merz* case with prejudice. That date is less than six years before Cytophil filed its bankruptcy petition, giving rise to Cytophil's bankruptcy estate from which Jansson seeks payment by filing a proof of claim. Under *Lowe*, Jansson's claim is not barred or limited by the applicable statute of limitations, Wis. Stat. §893.43(1), because Jansson's claim for Cytophil's breach of the engagement agreement did not "accrue" more than six years before the petition date.

HPA has shown no persuasive reason to predict that the Wisconsin Supreme Court would overrule *Lowe* or hold it inapplicable to Jansson's cause of action against Cytophil. In refusing to modify a century-old accrue-on-breach rule, *CLL* suggests that the Legislature is ordinarily better positioned to adjust when claims are deemed to accrue for statute of limitations purposes. *CLL*, 497 N.W.2d at 119 ("If the general rule that we uphold today creates unjust results in specific situations not now before this court, *i.e.* in the consumer context where contracting consumers have limited bargaining power, the legislature, with its greater resources for weighing policy, is best equipped

to enact specific ameliorative laws."). There can be no concern, however, that the Wisconsin Supreme Court would be encroaching on the Legislature's proper domain in applying its own 126-year-old accrual rule to a law firm's cause of action against its client. This is uniquely the realm of the Wisconsin Supreme Court—the branch of State Government that promulgates and enforces the very Rules of Professional Responsibility that require lawyers like Jansson to continue representing their litigation client until the matter is concluded or the attorney is granted leave to withdraw, regardless of how behind on payment the client has fallen. As *Walker* observed only a few years after Wisconsin joined the Union, the adversarial system is not advanced by forcing lawyers to sue their clients for not remaining current on their bills while litigation continues. *Walker*, 16 Ill. at 343. Litigation often has a long tail—one that sometimes offers the victor hope of recovering its attorney's fees from its adversary under statutory or contractual fee-shifting provisions. See, e.g., 15 U.S.C. §15(a) (entitling private plaintiff who is "injured in his business or property" by an antitrust violation to recover "a reasonable attorney's fee"); 35 U.S.C. §285 (entitling party prevailing in "exceptional" patent cases to recover "reasonable attorney fees"). Civil actions may remain ongoing for years before a trial court enters a final order and all appeals are exhausted. Neither *CLL* nor any other authority HPA has cited suggests that Wisconsin public policy favors forcing litigants and their lawyers to negotiate tolling agreements or worse, forcing counsel to commence litigation against their clients to recover overdue fees while continuing their representation of those clients in ongoing litigation. *Lowe*'s accrual holding sensibly avoids that impractical course; so, again, the Wisconsin Supreme Court is unlikely to discard *Lowe*'s rule or deem it inapplicable in circumstances like those presented here.

### III

For the reasons stated, IT IS ORDERED that Health Policy Associates' objection to allowance of Jansson Munger & McKinley Ltd.'s claim is overruled, and Jansson Munger & McKinley Ltd.'s claim (claim number 10) is allowed as a non-priority unsecured claim in the amount of $1,327,902.28.

#####